AUSTIN MOLONEY, Appellant, v. BOATMEN'S
BANK.

Division Two, June 23, 1921.

1. **NEGLIGENCE: Fire: Bracing Wall: Question for Jury.** It was for the jury to decide whether the defendant, whose seven-story building had burned, could have so braced the standing wall as to prevent it falling, in time of a high wind, upon an adjoining building, where there is positive expert testimony to the effect that the wall could not have been braced, and that an attempt to brace it would have been futile and extremely hazardous to those undertaking to do the work.

2. ———: ———: ———: **Duty to Adjoining Owner.** Where there was no imperative necessity to repair the damage to an adjoining building caused by a fire in defendant's seven-story building, the

defendant owed to an employee of the owner of said adjoining building who had been employed in the work of repairing it, the same duty to remove the high wall left standing, as a menace, that it owed other citizens.

3. ———: ———: **Unbraced Wall: Dead Bodies.** An athletic building was destroyed by fire, and the bodies of thirty or more persons were buried in the wreckage; on the following day, the upper part of the west wall fell upon and damaged the rear end of an adjoining building, but the rest remained standing, and the expert testimony was to the effect that it could not be braced, and about eight days after the fire, at a time of a high wind, it fell towards the east, but buckled and a part of it fell upon said adjoining building and injured plaintiff, who had been employed by its owner to assist in repairing it, and he sues on the theory that it was the duty of defendant either to brace or wreck the west wall, because defendant knew that people were going in and out of said adjoining building. *Held*, that defendant had no right to throw down the wall upon the dead bodies in the ruins of the burnt building, but on the contrary it was its duty, as a matter of common humanity, to rescue them as quickly and with as little mutilation as was reasonably possible. And, *Held*, further, that defendant had no right to throw the wall upon the adjoining building unless there was immediate necessity therefor; and it being the opinion of those in authority and qualified to speak that the wall, though dangerous, would stand until the bodies were recovered, and it being uncontradicted that when the last body was removed cables were being placed and arrangements made to pull the wall down upon the defendant's lot, when it was suddenly blown down by a violent wind, the verdict and judgment for defendant were for the right party.

4 **ERRONEOUS INSTRUCTION:** Verdict for Right Party. When the verdict is manifestly for the right party and a different result could not have been reached by the jury under the law, it should not be disturbed because of technical error in the instructions.

Appeal from St. Louis City Circuit Court.—*Hon. Thomas C. Hennings*, Judge.

AFFIRMED.

*Hudson & Hudson* and *Safford & Marsalek* for appellant.

(1)   Instruction number seven given for defendant was erroneous, because it ignored the issue of defendant's negligence in failing to brace or secure the wall. Price v. Met. St. Ry. Co., 220 Mo. 463; Orr v. Bradley, 126 Mo. App. 148; Steffens v. Fisher, 161 Mo. App. 395. (a)   The burden was upon defendant to show that the fall of the wall was not due to negligence on defendant's part in any respect. Turner v. Haar, 114 Mo. 346; Franke v. City, 110 Mo. 526; Teepen v. Taylor, 141 Mo. App. 286; Scharff v. Const. Co., 115 Mo. App. 167; Lynds v. Clark, 14 Mo. App. 74; Cork v. Blossom, 162 Mass. 333; Dettmering v. English, 64 N. J. L. 16; 3 Shearman & Redfield on Negligence (6 Ed.), sec. 702, p. 1826.   (b) Negligence in failing to secure or protect a wall, damaged by fire, as a result of which it falls and causes injury to another, renders the owner liable.   Teepen v. Taylor, 141 Mo. App. 286; Reinhardt v. Holmes, 143 Mo. App. 222; Schwartz v. Adsit, 91 Ill. App. 580; Biedler v. King, 209 Ill. 310; Nordheimer v. Alexander, 19 Can. S. C. 248.   (c)   A wall left standing in a dangerous condition after a fire is a nuisance, and the owner is required to use such care as will absolutely prevent injuries thereby, after a reasonable time to inspect the wall.   Ainsworth v. Lakin, 180 Mass. 401; Grogan v. Foundry Co., 87 Mo. 328; Simmons v. Everson, 124 N. Y. 319; Lynds v. Clark, 14 Mo. App. 79.   (d)   The fact that there were dead bodies in the ruins did not justify defendant in failing to exercise proper care, as above defined, with respect to the wall.   Lauer v. Palms, 129 Mich. 671; Green v. Eden, 28 Ind. App. 583; Smith v. Am. Soc., 7 Misc. 158, 27 N. Y. Supp. 315; Guiney v. Railroad, 167 Mo. 604; City v. St. Ry. Co., 90 App. Div. (N. Y.) 66, 182 N. Y. 536; Gentry v. Railroad, 172 Mo. App. 138.   (2)   Instruction number eight, given for defendant, misstates the law in the following respects:

(a)   It fails to require the jury to find that defendant exercised ordinary care.   Charless v. Rankin, 22 Mo. 573; Teepen v. Taylor, 141 Mo. App. 285.   (b)   It erroneously authorizes the jury to find that defendant could escape liability by delegating to others its duty of caring for its dangerous premises.   Teepen v. Taylor, 141 Mo. App. 282; Charless v. Rankin, 22 Mo. 566; Dillon v. Hunt, 105 Mo. 161; Carson v. Const. Co., 189 Mo. App. 126; Sessengut v. Posey, 67 Ind. 408; Steppe v. Alter, 48 La. Ann. 367; City of Anderson v. East, 117 Ind. 130; Engle v. Eureka Club, 59 Hun, 593, 14 N. Y. Supp. 184; Cork v. Blossom, 162 Mass. 330; Lawver v. McLean, 10 Mo. App. 590.   (c)   It erroneously permits the jury to find that defendant could delegate its duty of inspection to persons not competent to pass upon the condition of the wall.   Pollock on Torts (Webb's American Ed.) p. 542; Clark v. Pope, 70 Ill. 133; Sherman v. Bates, 15 Neb. 18; Schreiner v. Miller, 67 Iowa, 91. (3)   Instruction number nine given at defendant's request, is erroneous in singling out and commenting upon the fact that there were bodies in the ruins, and ignoring all other facts in evidence to be considered by the jury in determining whether defendant exercised ordinary care.   Strother v. Milling Co., 261 Mo. 22.   (4) Instruction number eleven states that in considering the condition of the wall and defendant's duty regarding the same before it fell, defendant could consider only the facts and conditions which existed at the time and was not able to take into consideration facts or conditions which subsequently developed.   This statement is not the law.   Defendant was required to and could consider not only the existing condition of the weather but conditions which were reasonably likely to arise.   Jones v. Railroad, 178 Mo. 546; Steffens v. Fisher, 161 Mo. App. 393; Teepen v. Taylor, 141 Mo. App. 285; Brash v. City, 161 Mo. 437; Woods v. City, 58 Mo. App. 272; Benton v. City, 248 Mo. 111.   (5)   The testimony of witness McKelvey over plaintiff's objection, that since the accident he had

not been apprised of anything that under the circumstances then existing could have been done to handle the situation in a safer manner than that in which it was handled, was improper and constituted an invasion of the province of the jury. The testimony of witness Whitaker that in handling the situation after the fire he was doing the best he could and was doing about anything any man could do under the circumstances, was improper. It was a conclusion and invasion of the province of the jury. Dammann v. City, 152 Mo. 200; Disbrow v. Ice Co., 170 Mo. App. 585; Landers v. Railroad, 134 Mo. App. 80; Central Railroad Co. v. Bagley, 121 Ga. 781; Springfield Railroad Co. v. Puntenney, 101 Ill. App. 98, 200 Ill. 9. (6) The testimony of witness Whitaker that after the fire the city was in charge of the bank's property and the bank had no possession of it at all, was improper, as a conclusion of law and an invasion of the jury's province. Kendall Co. v. Bain, 46 Mo. App. 581. Furthermore, it was an incorrect conclusion of law. 1 Thompson on Negligence (2 Ed.), sec. 579, p. 535; Id. p. .553; City v. East, 117 Ind. 126.

*Lehman & Lehman, Abbott, Fauntleroy, Cullen & Edwards* and *Curlee & Hay* for respondent.

(1) The defendant was warranted in allowing the wall to stand, as it was when the fire was extinguished, while the work of rescuing the dead bodies was being prosecuted, provided a reasonably careful and prudent person would have done so, under the same circumstances. Orr v. Bradley, 126 Mo. App. 146. (2) (a) Defendant had no right to throw or pull the wall upon the premises of the Seed Company, unless there was an immediate and imperative necessity therefor. American Paint Works v. Lawrence, 3 Zabriskie, 590, 57 Am. Dec. 420; Hale v. Lawrence, 1 Zab. 714, 47 Am. Dec. 190. (b) Defendant had no right to throw the wall upon the dead bodies, caught in the ruins, and would have been

liable for so doing, to the relatives of the dead, unless exercised upon the doctrine of necessity above stated. Larsen v. Chase, 47 Minn. 307, 28 Am. St. Rep. 370; Foley v. Phelps, 1 N. Y. App. Div. 551; Kyles v. Southern Railroad, 147 N. C. 394; Pierce v. Proprietors of Swan Cemetery, 10 R. I. 227, 14 Am. Rep. 667; Floyd v. Atl. Coast Line Ry. Co., L. R. A. 1915B, p. 519. (c) It was defendant's duty to rescue the dead bodies as quickly and with as little mutilation as possible. Cases last cited. (3) It was not necessary for the officers of defendant personally to supervise and direct the work of rescuing the dead bodies and caring for the ruins of the burned building. Defendant had the right to delegate such task to competent and reputable agents. If defendant did so, and if such agents exercised such care in accomplishing the work as a reasonably careful and prudent person would have exercised under the same circumstances, then defendant is not liable. New Orleans & Northeastern R. R. Co. v. Jopes, 142 U. S. 18; McNerney v. Forrester, 19 Wash. L. Rep. (Can.) 32; Olsen v. Meyer, 46 Neb. 240. (4) Even if it should be found that some of the instructions are subject to criticism or that "they may not come fully up to the standard of perfection required by the criticisms of defendant's learned and ingenious counsel," yet it must be held that "upon the whole of the evidence the verdict was manifestly for the right party" and should be affirmed. R. S. 1919, sec. 1276; Peterson v. Transit Co., 199 Mo. 344; Shinn v. Railroad, 248 Mo. 182; Noble v. Blount, 77 Mo. 239; Haehl v. Railroad, 119 Mo. 344; Fox. v. Windes, 127 Mo. 514; Sherwood v. Ry. Co., 132 Mo. 344; Schuepbach v. Gas. Co., 232 Mo. 612; Mockowik v. Railroad, 196 Mo. 568; Moore v. Lindell Ry. Co., 176 Mo. 545; Litzegren v. United Rys. Co., 227 S. W. 929; McManama v. Railroad, 175 Mo. App. 54.

HIGBEE, P. J.—The defendant owned a seven-and-a-half story brick building at the northwest corner of the

intersection of Fourth Street and Washington Avenue
in the City of St. Louis, fronting 100 feet on Washington
Avenue and extending north about 120 feet. The greater
portion of it was occupied by the Missouri Athletic Club.
This building was about 90 feet in height. The west wall
was 30 inches thick at the base and 18 inches at the top;
the west side was perpendicular; the east side was brok-
en by steps or offsets about 20 feet apart where the wall
was reduced in thickness. There were rows of windows
in the wall at the fifth and sixth floors. Adjoining on the
west was four-story brick building leased by the St.
Louis Seed Company. The west wall of the defendant's
building extended about 40 feet above the Seed Com-
pany's building. It had a frontage of about 35 feet and
a depth of about 100 feet.

On Monday, March 9, 1914, the defendant's build-
ing was destroyed by fire, which started very early in
the morning of that day and was not extinguished until
about 4:30 p. m. of the following day. On the first day
of the fire the north end of the upper part of the west
wall of defendant's building fell upon and damaged the
rear part of the Seed Company's building. The fire gut-
ted the interior of defendant's building, except the part
occupied by the bank at the southeast corner of the build-
ing and a row of rooms and adjoining hallway on each
floor at the south end of the building. The wreckage
sank to the basement, forming a mass of debris reach-
ing, in some places, to the third story of the building.
During the fire a large part of the east wall fell into
Fourth Street. The north, south and west walls, ex-
cepting the portion above mentioned that fell, remained
standing. It was known that many of the roomers in the
building had perished in the fire and that their bodies
were buried in the wreckage.

Mr. Whitaker, president of the bank, during the af-
ternoon of the first day of the fire, attempted to get into
communication with several construction companies to
arrange for the removal of the bodies and take care of

the ruins of the building. James H. McKelvey, the Building Commissioner of the City of St. Louis, testified that on Wednesday morning, after consultation with Henry Kiel, Mayor of the city, he placed thirty men at work on the ruins of the building, removing debris and searching for bodies, and that on the afternoon of that day he told Whitaker it was the duty of the Building Commissioner to take charge of the premises because of their dangerous condition and that he already had men there removing portions of the east wall. Whitaker thereupon agreed that McKelvey should take charge of the building and arranged to pay the necessary force to do the work required on the building and for the removal of the bodies. McKelvey was in charge of the work until the second section of the west wall fell on March 17th. The bank sent a man to keep the time of the men employed on the ruins and to pay them at the end of each day's work. It was admitted that McKelvey and the men under him took charge as representatives of the defendant.

The work of searching for the bodies and the removal of the debris was carried on unremittingly by a force of men working in two shifts, starting with about thirty men and increasing from day to day to about two hundred men in each shift by March 17. McKelvey personally supervised the work by day, and George Frederick, his chief deputy, at night. Seven inspectors from the Building Commissioner's office acted as foremen. These were paid by the city. Thirty bodies were recovered from the debris, the last one being taken out at about noon of March 17th.

About the second day after the fire, the Wimmer Construction Company was employed by the lessor of the Seed Company to repair the damage to its building caused by the fall of the north part of the west wall of defendant's building during the fire. It employed plaintiff and other laborers in this work. Shortly before 2:10 p. m. on March 17th, a strong wind arose and blew over

another section of the west wall of the bank building. The top part of the section fell to the east, while the lower part buckled and fell to the west upon the Seed Company's building, causing the entire four floors of the north third of the building to collapse. Plaintiff, who was working in the basement, was buried under the wreckage, and after several hours was rescued by the city firemen. He sustained serious, permanent injuries, the gravity of which is not questioned. He brought this action on March 21, 1914. The third amended petition charges that the defendant negligently caused and permitted the west wall of said building to collapse and fall upon said building while plaintiff was so on said premises, to his damage in the sum of $50,000. The cause was tried to a jury, resulting in a verdict for defendant.

Charles E. Swingley, chief of the fire department of the City of St. Louis, called by plaintiff, testified in substance: He had 45 years' connection with the fire department and had continuous active experience in handling and extinguishing fires, examination of buildings, and in observing buildings after fires and noting their condition as to strength and durability; that he arrived at this fire about five minutes after it started and that it burned nearly two days; he made a close, ocular inspection of the west wall with one of his assistants, together with the Mayor and Mr. McKelvey, for the purpose of arriving at an opinion as to the reasonable safety of the wall under ordinary conditions that might prevail at that time of the year. He further testified:

"I noted the condition of the wall in question after the fire. I am familiar with buildings and walls as to their vitality and durability. During my long experience in the fire department I observed measures taken to protect walls, and things of that sort. I know of no practicable, reasonable way in which that wall could have been braced to have rendered it more safe than it was after the fire, without building scaffolding, which would have required a great deal of time. That scaffolding would have

had to rest on this debris and the building as a foundation, unless it was removed to get a solid foundation for it. I do not think it could have been braced with any degree of strength and stability without getting down beneath the debris and resting the braces on the basement of the building. The very work that was being done at the time the wall fell would have been necessary to have a proper basis and foundation for the scaffolding to brace the wall. It would have required three or four days anyway to have built the scaffolding that would have properly braced this wall; I don't know whether they could have done it that soon. There was no way that I know of, of removing this wall in any reasonable time, taking it down, without throwing it on the wreckage or debris of the building and the bodies therein. I examined it with reference to whether or not it could be removed or could be braced. There was a conference in which I participated, along with other gentlemen, as to the proper course to be followed in the matter of the removal of the bodies, the wreckage of the building, and of their condition and the caring for the walls.''

It was his opinion that the wall had sufficient strength to stand without any wind; that a high wind would blow it over; a thirty-mile gale would endanger the lives of persons near the wall.

Louis R. Lindley, called by plaintiff, testified that he was employed in the removal of the wreckage; that he had twenty-five years' experience in wrecking dangerous walls, and was familiar with the manner of bracing them; that he saw two cracks in the west wall, 10 or 15 feet apart at the bottom; the part of the wall between the cracks fell March 17th on the Seed Company's building; the wind was blowing 20 to 25 miles per hour. The fall could have been prevented by bracing the wall with guy lines to the east and west and timbers; in this way the wall could have been pulled down without its falling to the west; it could be broken off at any story; it would take eight men eight hours to brace the wall in the man-

ncr described; a fire has a tendency to cause brick to crumble and weaken and a man takes chances .in my business; it is all a game of chance; ''I never mentioned this to a living soul connected with it that I could do it and that I would brace up the wall and do it differently from them.''

Harry Moran, plaintiff's witness, who characterized himself as a steeplejack, stack painter, hobo traveler, rigger and laborer for twenty-five years, said, in substance, that he saw the west wall shortly after March 9th; it could have been rigged at that time so as to prevent it from falling, by placing timbers inside the wall, and outside from the Seed Company level, lashing the timbers through the windows, and then guying the wall east and west. With the guys the wall could be thrown either way. When so braced it could not fall if there were a fifty-mile wind and could not buckle. It would have taken four men a good day to do the work spoken of by the witness. He knew the wall was dangerous.

E. M. Hubbard, cashier of the bank, plaintiff's witness, testified: ''The Building Commissioner (McKelvey) was in active charge, superintending and directing the work of removing the bodies and taking out the wreckage and caring for the premises between the ninth and seventeenth of March. What we did immediately after the fire was to confer with men experienced in handling that sort of work, and when the Building Commissioner took charge we put those things in his hands and rendered whatever assistance we could.''

Plaintiff testified: ''When I came in the Seed Company gate from Lucas Avenue, I could see those walls standing there in the bank building. I knew those walls were there and that a fire had gutted that building and went in to work in the Seed Company's store immediately next to the wall that fell, and worked there until it fell. I looked at the wall several times during the five days I worked in that vicinity, looked at them every day mostly. The wall that fell was the only one to be seen. I saw

that every day. I don't know whether it was safe or dangerous. During the time I worked there, I saw some of the men working in the debris and wreckage of the bank building. .. . . I knew there were dead bodies in there, and that they were hunting for them and bringing them out, but did not see any of them carried out. The foreman of the Wimmer Construction Company was there, in charge of us men, all the time I worked in the Seed Company's building.''

McKelvey, the Building Commissioner, and other officials in charge, inspected the walls and not only concluded that there was no practicable way to brace the west wall, but that it would stand for a reasonable time and that it was reasonably safe to proceed with the rescue of the bodies in the debris. Referring to the west wall, McKelvey testified: ''The only reason we did not wreck the walls sooner was because we wanted to remove the dead bodies first. I devoted all my attention at all times to work in the Boatmen's Bank building. I had 400 men under my supervision during twenty-four hours. The men who had supervision and control were under me as officers of the city and were paid by the city. . . . When the thirtieth body was recovered, I took the word of the chairman of the committee that they were all out of the building. If I remember properly we had cables over the walls ready to commence taking them down when the wall gave way. While we were looking for the bodies, preparations were being made for taking down the walls.''

Ross Halleck, an architect, and Henry Rufch, a structural engineer, both connected with the Building Commissioner's office, were of the opinion that the wall would stand a reasonable length of time under the condition it was in. The latter's conclusion was it would stand a wind of thirty and probably up to fifty miles per hour.

Henry Kiel, Mayor of the city, testified that he had been a builder, bricklayer and contractor for twenty-five years. He examined the west wall after the fire. He

saw no overhanging of the wall which he would consider a dangerous condition and no bulges. It was not damaged to any great extent by the fire and witness commented upon the wall being in good condition at the time Witness stated he was familiar with the manner in which a wall is kept from buckling when being pulled, by lashing timbers to it, but in his opinion neither lashing timbers to the wall in question nor shoring it would have strengthened the wall or prevented it from falling to the west.

McPheeters, chief of the Board of Police Commissioners, testified the streets in the vicinity of the bank were at first roped off. Several days before the 17th he had the ropes changed so as to permit people to enter the buildings on the north side of Washington Street, including the seed store. After that people entered the seed store, and there was a natural flow of people going to the seed store and the one next to it all the time.

Edward M. David, a house building contractor for fifteen years in St. Louis, whose business was shoring and bracing walls, testified: "I saw the wall also from the Seed Company's yard and from the inside of the building. It was my opinion that with the present weather conditions the wall would probably stand, but I would not care about being in there if we had any high winds, any extreme or unusual conditions. From my experience as a shorer and rigger, in my judgment, there wasn't any practical way in which that wall could have been shored or braced so as to contribute to any extent to the safety of the wall without endangering the lives of the workmen put on the wall, which was leaning in six inches at least. . . . You could have built a scaffold above the Seed Company's building, but it would not have extended back as far as the break. You could build it up with six by sixes just as high as you might want, up to the top of the wall, but I don't know whether the roof would have carried a load like that. You could not get six by sixes 35 feet long to extend across from one wall

of the Seed Company. They are not carried in stock here. I would not have a man put a forty-foot ladder up the side of this wall and climb up that ladder on account of weather conditions. For that reason I think men couldn't have gotten up there and put any rigging on the wall. They couldn't put cables that high. Cables are pretty heavy to pull up. We tried it on the south wall, the east corner, and couldn't do it. . . . I wouldn't care to send men up. . . . After I inspected the wall I worked in and about the wall until the seventeenth, when the wall fell."

James Smythe testified when the wall fell there were three or four men on the top floor of the Missouri Athletic Club building. They were then wiring the walls. They were going to pull the walls that evening after six o'clock. They had put cables all over the walls.

M. J. Montgomery testified in rebuttal: that he was a carpenter, and had had extensive experience in bracing walls; that the west wall could have been prevented from falling over on the Seed Company by bracing it from the Seed Company's roof. In half a day it could have been braced by three men in such a way that it would not have fallen to the west. "I went to work there on the west side of the wall, considering that the wall was safe enough to warrant my going to work if they let it alone."

The first instruction for the plaintiff was: "That the law presumes the falling of the wall was due to some negligence of defendant, and you will find in favor of the plaintiff unless, in view of all the evidence in this case, you find that the defendant has shown by a fair preponderance of the evidence that said wall did not fall as the result of any negligence on its part. Second, that you cannot find against plaintiff on the ground of contributory negligence. Third, even though you find the Wimmer Construction Company, the St. Louis Seed Company, its lessor or either of them were guilty of negligence, such negligence cannot be attributed to plaintiff so as to preclude a recovery."

Appellant complains of the following instructions given for the defendant.

"7. The jury are instructed that the defendant had the legal right to have and maintain the wall in question upon its own property and that it was not an insurer of its safety, provided you find from the evidence that in suffering such wall to stand upon said property it exercised such care as an ordinarily prudent person would exercise under the same or similar circumstances, and if you so find, your verdict should be for the defendant.

"8. If the defendant, within a reasonable time after the fire, arranged with certain persons to recover the bodies in the ruins of the building, and if you further find that the said persons were competent and reputable workmen for the task for which they were engaged, and if you further find that said persons examined the wall, which fell, and the premises with reasonable care and believed that the said wall was sufficiently sound and stable to reasonably warrant them in undertaking the recovery of the dead bodies, before removing said wall, and if you further find that with reasonable diligence and prudence they entered upon the work of recovering said bodies, and that while they were so engaged and before they had had time, by the exercise of reasonable care and diligence, to complete said work of removing said bodies, the wall fell and injured plaintiff, then your verdict should be for the defendant.

"9. The jury are instructed that even though you may believe from the evidence that the wall, in question, and which fell on March 17, 1914, and injured plaintiff, was in fact in a weakened condition, yet, if you find that in the wreckage of the bank building, a number of human bodies were buried in the ruins of said bank building, and that from the date of said fire, defendant had, with reasonable diligence and prudence, been engaged in the work of trying to locate and recover such bodies and removing the wreckage so as to locate and remove the dead, and that from the time of the fire to the time

that plaintiff received his injuries, a reasonable time for the recovery of said bodies had not elapsed and that in the doing of such work, and in what defendant did, if anything, as shown by the evidence, in regard to the removal of the wreckage and the care of walls of the building, the defendant acted as a reasonably prudent person would have acted under like circumstances; then your dict should be for the defendant.

"10. The jury are instructed that although you may find from the evidence that the wall in question was so damaged and weakened by fire as to be unsafe as a permanent structure, yet if you find that it was in such a condition as to appear to a reasonably prudent man to be reasonably certain to stand for a sufficient time to enable defendant, by the exercise of reasonable diligence, to remove the bodies from the ruins of said building, and if you further find that a reasonably prudent man would have permitted said wall to stand for such time and that the defendant undertook, with reasonable diligence, to remove such bodies and was so engaged between the date of said fire and the date on which said wall fell, and if you further find that the said wall fell before defendant had had time, by the exercise of reasonable diligence, to remove said bodies, then your verdict should be for defendant.

"11. In determining the condition of the west wall of the building in question and defendant's duty with regard to the same before the said wall fell, defendant could consider only the facts and conditions which existed at the time and was not able to take into consideration any facts or conditions which subsequently developed; hence if you find from the evidence that defendant examined and considered said wall and its duty with regard thereto with the care and prudence which a reasonably careful and prudent man would have exercised under the same circumstances, and did in the premises what such a man would have done under the same circumstances and that notwithstanding such fact

said wall fell as a result of conditions and elements over which defendant had no control, then your verdict should be for the defendant."

I.   The defendant's building was destroyed by fire on March 9th and 10th.   Large numbers of anxious people congregated about the ruins until the bodies were rescued.   The relatives of persons known to have been in the building and their sympathizing friends were overwrought by the dire tragedy.   No one knew who or how many had perished in this awful holocaust.   Confronted by these appalling conditions, the great and compelling duty of the officials of the bank and of the city, as they believed, was to rescue the bodies of the victims. In appellant's printed argument it is said:

"With respect to defendant's care or lack of care, regarding the wall which fell and injured plaintiff, the outstanding facts were that after the fire the wall, ninety feet high, weakened, cracked and leaning, was permitted by defendant for eight days to stand above a building in which people were constantly present, without any attempt being made either to brace the wall or to take down any part of it.   .   .   .   He [McKelvey] stated that the only reason the wall was not wrecked sooner was because he wanted to remove the dead bodies first.   Concededly this reason did not constitute a legal justification for jeopardizing the lives and limbs of the persons whom he knew were constantly going in and out of the seed company building.   His act in permitting the wall to stand in its dangerous condition, without bracing, was an act of gross negligence."

II.   It was a question for the jury whether the defendant in the exercise of ordinary care, could or could not have braced or shored the wall.   The testimony of plaintiff's expert witness, Swingley, together with that of the defendant's experts, was to the effect that the wall could not have been braced or shored, and that an attempt to have done so would not only

*Jury Question.*

have been futile but extremely hazardous to the lives of those undertaking the task. We think the jury was justified by the overwhelming weight of the evidence in finding that the wall could not have been braced or shored and that the falling of the wall was not due to defendant's negligence.

III. Appellant contends that, as a matter of law, the first and paramount duty of the defendant was either to brace or wreck the west wall, because defendant knew people were going in and out of the Seed Company's building. It is clear from plaintiff's evidence that he knew that rescuers were recovering bodies from the burned building. He looked at the wall several times during the five days he worked in the Seed Company's building. He was under the charge of the foreman of the Wimmer Construction Company all of the time he worked there. It was not claimed that there was any imperative necessity for the plaintiff or his employer to undertake this hazardous work in the face of the imminent dangers portrayed by appellant's counsel. So far as this record discloses, that work could have been delayed until the bodies were removed and the wall was wrecked. This work was voluntarily undertaken three days after the search for the victims of the fire began. Plaintiff sustained no relation to defendant. Defendant owed the same duty to appellant that he owed to other citizens. Under ordinary circumstances there can be no doubt that, in view of the fact that the wall could not be braced or shored, it would have been defendant's duty to have pulled it down so that it would not have been a menace to persons who might be exposed to the danger of its falling, but, under the circumstances of this case, to have thrown the wall either to the east or to the west would have been without moral or legal justification.

Rights of Dead Body.

The defendant had no right to throw the wall upon the dead bodies in the ruins of the building. At common law it was an offense to treat a dead human body indecently. [17 C. J. 1148.] An action for damages will lie for the unauthorized mutilation of a dead body. [Ib. 1144, sec. 18.]

"The right is to the possession of the corpse in the same condition it was in when death supervened. It is the right to what remains when the breath leaves the body, and not merely to such a hacked, hewed and mutilated corpse as some stranger, an offender against the criminal law, may choose to turn over to the afflicted relative." [Foley v. Phelps, 37 N. Y. S. 471.]

It was held, in Kyles v. Southern Ry. Co., 147 N. C., 394, 61 S. E. 278, where a section-master negligently permitted remains to be exposed on a track and failed to care properly for them, that the company was liable to decedent's widow for actual physical and mental suffering sustained by her through knowledge thereof, although the section-master acted in good faith, believing he was bound to await the arrival of the coroner before disturbing the remains. The court said, at pages 400, 402:

"The defendant also owed the plaintiff the duty to gather the body and its fragments and prepare the same for burial, and a negligent failure to do so was an infringement upon her legal rights and therefore actionable [citing cases]. Parts of the body were left along the track and gathered up by the father on the Monday following. . . . Respect for the dead is an instinct that none may violate. The democracy of death is superior to the edicts of kings. Rizpah became forever famous among her kind when she defied the king of Israel who would treat the bodies of her dead with contempt. Sophocles has immortalized Antigone, who vindicated the like sentiment of human nature as a higher law than that of her sovereign. It is no answer to such negligence or indifference to say that the defen-

dant did not remove the body from the track because waiting for the coroner. Humanity and decency required that the body and its scattered members should be reverently picked up, laid off the track in some nearby spot, sheltered by a covering from the sun and flies and dust and irreverent eyes, and protected from the dogs by some better agency than, according to the testimony, the volunteer aid of small boys attracted thither by curiosity, but who showed more respect for humanity than those who represented this defendant.

"That there is no right of property in a dead body, using the word in its ordinary sense, may well be admitted. Yet the burial of the dead is a subject which interests the feelings of mankind to a much greater degree than many matters of actual property. There is a duty imposed by the universal feeling of mankind to be discharged by someone toward the dead; a duty, and we may also say a right, to protect from violation; and a duty on the part of others to abstain from violation; it may, therefore, be considered as a sort of *quasi*-property, and it would be discreditable to any system of law not to provide a remedy in such a case." [Pierce v. Proprietors of Swan Cemetery, 10 R. I. 1. c. 237; Floyd v. Ry. Co., L. R. A. 1915B, 519.]

It was therefore the duty of defendant, as a matter of common humanity, to rescue the bodies of the victims from the debris as quickly and with as little mutilation as was reasonably possible.

IV.    Again, it is well settled that the defendant had no right to throw the wall upon the Seed Company's building unless there was an immediate necessity therefor. It was the opinion of the Mayor of the city, the Building Commissioner, the chief of the fire department and others whose experience qualified them to speak authoritatively, that the wall, though dangerous, would stand until the bodies were recovered from the ruins of the building. It is uncontradicted that when the

Trespass.

last body was removed, cables were being placed on the west wall and arrangements were being made to pull the wall, when it was thrown down by a violent wind that suddenly blew from the northwest.

In Hale v. Lawrence, 1 Zabriskie, 714, 47 Am. Dec. 190, l. c. 194, it is said:

"A man may justify taking the life of an adversary where it is necessary to save his own, or destroying his neighbor's property, in some cases, for the preservation of his own. So the people of a neighborhood may justify a trespass on another's grounds to destroy noxious animals; and in a densely populated town, all may unite in destroying a building to stop a conflagration which threatens destruction to the rest. But in all these cases the act done is in the individual capacity of him who does it, and it is done upon his own responsibility and at his own peril. The law esteems all private property sacred from the violent interference of others, and he who takes, injures, or destroys it, will be held a trespasser, until he shows a justification. A necessity, extreme, imperative or overwhelming, will constitute such a justification, but mere expediency, or public good, or utility, will not answer. The public interest or welfare is not left in the keeping of private individuals. This justification, therefore, under a plea of necessity, is always a question of fact, to be tried by a jury and settled by their verdict, unless the sovereign authority shall have constitutionally provided some other mode."

See, also, American Print Works v. Lawrence, 3 Zabriskie, 590, 57 Am. Dec. 420.

The question has frequently arisen in cases where walls have been allowed to stand after being damaged and weakened by fire. In such cases the owner is required to exercise ordinary care to keep the walls in safe condition. [Orr v. Bradley, 126 Mo. App. 146; 3 Shearman & Redfield on Negligence (6 Ed.), p. 1826, sec. 702; Hudgins v. Hann, 240 Fed. 387; Swentzel v. Holmes, 175 S. W. 871; 29 Cyc. 365.] The duty of inspection may be dele-

gated to competent and experienced builders, provided due care is exercised. in making the inspection. [Olson v. Meyer, 46 Neb. 240, 64 N. W. 954, and cases cited supra.

V. It is contended that defendant's instruction numbered 7 ignores his duty to brace or secure the wall. It required the jury to find that in suffering such wall to stand, the defendant exercised such care as an ordinarily prudent person would have exercised under the same or similar circumstances. The jury would clearly understand this to mean the wall as it stood, unbraced and unsecured. This instruction eliminates the vices in an instruction condemned in Orr v. Bradley, supra, and is authorized by the learned opinion in that case. The other criticisms leveled against this instruction are without merit.

*Instruction 7.*

VI. Appellant criticises defendant's instruction numbered 8, (1) that it fails to require the jury to find that the defendant exercised ordinary care; (2 and 3) that it authorized the jury to find that defendant could escape liability by delegating to others not competent to pass on the condition of the wall, its duty of caring for is dangerous premises, and (4) it adopts an incorrect measure of the strength of the wall to justify defendant in permitting it to stand without bracing. A simple reading of the instruction shows that the criticisms are without merit.

*Instruction 8.*

VII. We do not think that defendant's instruction numbered 9 singles out and gives undue prominence to isolated parts of the evidence, as claimed by appellant. [Meux v. Haller, 179 Mo. App. 466, l. c. 475; O'Malley v. Musick, 191 Mo. App. 405, l. c. 413.] It is a general instruction.

*Instruction 9.*

"Instructions are to enable the jury to understand the law of the case. A few short, pithy and sententious instructions, embodying the law of the case, will always be better understood, and will have more effect on the

triers of the fact, than a long list of instructions, loaded with words, generally so involved that it tends to confuse rather than conduct the jury to a proper conclusion.'' [State v. Floyd, 15 Mo. 349, 355; Crole v. Thomas, 17 Mo. 329, 332; Talbot v. Mearns, 21 Mo. 427, 431.]

"The jury's mind should be focused on, and not diverted from, the issues.'' [Strother v. Milling Co., 261 Mo., l. c. 23.]

VIII.   The defendant's instruction numbered 11 is criticised in that it permits the defendant to act upon the appearance of the wall instead of requiring him to make careful inspection, and permits him to act on the opinion of a reasonably prudent man instead of a man capable of passing on the condition of the wall.  All of the witnesses for the defendant, including the fire chief, Swingley, plaintiff's witness who inspected the wall and testified to its conditions, were competent to give an opinion on the apparent strength and stability of the wall.  The jury could not have been misled by this instruction.

*Instruction 11.*

IX.   Instruction numbered 11 is further criticised in that, in determining the condition of the wall, defendant was required to consider only the facts and conditions which existed at the time, and was excused from forecasting the conditions of the weather which were reasonably likely to arise.  The instruction refers to the condition of the wall at the time defendant was compelled to act, and to act promptly in view of the appalling conditions.  It may be assumed that Whitaker and his co-laborers knew that the weather was an uncertain factor, "that the wind bloweth where it listeth and thou hearest the sound thereof, but canst not tell whence it cometh and whither it goeth.''  If the wall could not have been braced, or if an attempt to brace it would have been hazardous to the lives of the workmen, what alternative did defendant have other than the plan adopted?  A consideration of the weather could

*Anticipated Wind.*

not have suggested a different course of action. If there had been no human bodies in the ruins of the building, and defendant had neglected to pull down the wall without any sufficient reason therefor, and it had toppled over under the force of the wind and injured any one, a very different question would be presented. [Orr v. Bradley, supra.]

X. If the instructions did not go far enough in plaintiff's favor, he should have asked for others presenting the theories of the law contended for by him. [Drey v. Doyle, 99 Mo. 459.] The criticisms leveled at the defendant's instructions are purely technical. Sections 1276 and 1513, Revised Statutes 1919, forbid the reversal of a judgment for error which does not affect the substantial rights of the adverse party or materially affect the merits of the action. [Honea v. Railroad, 245 Mo. 621, l. c. 644.] When an erroneous instruction is given and the trial results in favor of the party at whose instance it was given, the presumption is that the error was prejudicial. But when the verdict is manifestly for the right party and a different result could not have been reached by the jury under the law, it should not be disturbed because of such erroneous instruction. [State ex rel. v. Stone, 111 Mo. App. l. c. 372, and cases cited.]

The errors complained of in the admission of improper evidence were not prejudicial. The verdict was for the right party and the judgment is affirmed. All concur.