Mary CROSBY (Plaintiff), Respondent,

v.

ST. LOUIS COUNTY CAB COMPANY, Inc.
(Defendant), Appellant.

No. 29936.

St. Louis Court of Appeals.
Missouri.

Feb. 17, 1959.

Motion for Rehearing or for Transfer
to Supreme Court Denied
March 13, 1959.

James J. Amelung, Holtkamp, Miller & Risch, St. Louis, for appellant.

Lawrence E. Ehrhart, St. Louis, for respondent.

RUDDY, Presiding Judge.

This is an appeal by defendant from a judgment of $3,500 in favor of plaintiff. A taxicab owned by defendant and operated by its employee struck the rear of an automobile operated by plaintiff when it was stopped behind another vehicle at or near an intersection. As a result of the collision plaintiff sustained personal injuries.

On April 24, 1956, plaintiff was operating her automobile westwardly in the middle lane on Clayton Road, which is a six-lane highway, three lanes east and three lanes west. The accident occurred about 5 P.M. The sun was shining and the street was dry. Plaintiff had one passenger in the car.

Plaintiff was driving her automobile westwardly on Clayton Road in heavy traffic and as she drew near to the intersection of Bellevue Avenue the automobile ahead of plaintiff's car came to a stop. Plaintiff also stopped and her car was the third car from the intersection in the mid-dle lane. Plaintiff's car when stopped was about three feet behind the car ahead. There were cars in the lane to the left of plaintiff but no cars in the lane to her right. After being stopped for approximately one minute, plaintiff's car was struck in the rear by a taxicab owned by the defendant and operated by William Leinert, its employee. No part of plaintiff's car struck the car in front. No sound of brakes being applied was heard before the collision. The radiator, headlights and fenders of defendant's car were damaged. The back and lid of the trunk on plaintiff's car were damaged and the bumper guards were pulled away from the pan attached to the car.

Plaintiff introduced in evidence certain questions propounded to and answers given by the defendant's driver, William Leinert, when his deposition was taken. The questions and answers indicate that the driver of the taxicab, William Leinert, prior to the collision, as he was driving westwardly on Clayton Road was engaged in some sort of an altercation with the driver of an automobile to his left. In his deposition when asked about the altercation, he said:

"A. * * * no, we wasn't arguing. I left him go until he kept pushing me over and all I said, what is the matter, sir, I have to make a turn, too.

"Q. And while you were saying that to him this traffic stopped in front of you? A. That is when I noticed the traffic, but I wasn't looking at him that far, there is no use in me saying I wasn't, I was talking to the man because *if I had my eyes in front of me I would have stopped my taxicab.*

"Q. You had your eyes towards him making this remark to him? A. Talking to him.

"Q. At that moment the traffic stopped? A. Yes, that is right, because I had control of my cab at all times.

"Q. If you had been looking, you would have stopped your cab, is that correct? A. I am—well, I said if I would have been looking straight ahead, but I did glance, because I knew I—the traffic was heavy, but I just happened to say, what is the matter, and then, bingo, I was there.

"Q. There was nothing between the car ahead to obstruct your vision? A. No, nothing at all."

At the trial William Leinert was offered as a witness by defendant. He testified that he made a left turn into Clayton Road off of Yale Avenue to go west on Clayton Road and in doing so he aroused the anger of another motorist who started "hollering something" at the witness. In the course of his testimony Leinert said: "I must have cut in front of him." When asked on cross-examination about any conversation he had with the man in the other car, he testified: "I didn't have no conversation with him. He was hollering at me, and I said to him—I was driving—I said, 'What do you want?'"

He further testified that he was traveling approximately ten miles an hour and could have stopped his car in 3 to 5 feet. At one point in his testimony he said that the plaintiff's car was about 5 to 7 feet in front of him. He was then asked this question:

"Q. Three to five feet. So there would have been distance between the car ahead of you and the cab to stop your cab if you had been looking? A. That's right, sir."

Again the witness testified as follows:

"Q. Your visibility was good that day, wasn't it? A. Fine, yes, sir.

"Q. You made a statement that 'if I had my eyes in front of me, I would have stopped my taxicab' did you not? A. At the time that I bumped the lady if I would have been looking straight I should have stopped my taxicab, I could have stopped my taxicab, certainly."

He further testified that he knew there was a car ahead of him and in his direct testimony, when asked if he had an opportunity to see the car with which he had the accident, he answered, "Yes, I seen it up in front of me, sir." When he was asked how long he had been following the car in front of him, he answered, "A block and a half, sir."

Instruction No. 1 authorized a verdict in favor of plaintiff if the jury found that defendant's taxicab overtook plaintiff's automobile when it was stopped and negligently and carelessly was allowed by the operator of the taxicab to run into and collide with the rear end of plaintiff's automobile.

Instruction No. 2 after instructing the jury that it was the duty of the driver of a motor vehicle to maintain a vigilant lookout to see and discover other vehicles on the highway, told the jury if it found that defendant's driver by keeping a vigilant lookout could have seen and observed plaintiff's automobile at the time and place it was stopped and that thereafter defendant's driver upon the first appearance of danger could have avoided striking and colliding with the rear end of plaintiff's automobile by stopping and slowing and swerving the taxicab, but that defendant's driver failed to do so, then the jury must find in favor of plaintiff.

■ Defendant contends that Instruction No. 2 is a humanitarian instruction which stated an abstract rule of law that had no application to a case submitted under the humanitarian doctrine when it stated that it was the duty of defendant's driver to keep a vigilant lookout to see and discover other vehicles upon the highway. Defendant is in error in contending that Instruction No. 2 was a submission to the jury under the humanitarian doctrine. It lacks a finding of all the elements necessary to recovery under the humanitarian doctrine and contains findings that have no place in a humanitarian instruc-

tion. We agree with plaintiff that Instruction No. 2 was one of primary negligence.

Defendant next asserts that if Instruction No. 2 is a submission of primary negligence based on defendant's failure to keep a lookout, the giving of the instruction was error for other reasons.

In the view we have taken of this case it is not necessary to rule on the other complaints of defendant against this instruction. This is so, because the verdict is obviously for the right party. The evidence before the jury in the trial court was such as to permit no other result. If the verdict returned by the jury was manifestly for the right party, and a different result could not be allowed to stand, then the verdict will not be disturbed, notwithstanding an erroneous instruction may have been given for the prevailing party. Moloney v. Boatmen's Bank, 288 Mo. 435, 232 S.W. 133; Green v. Boothe, 239 Mo.App. 73, 188 S.W. 2d 84; O'Dell v. Hurt, Mo.App., 106 S.W. 2d 526; Henry v. Missouri Ins. Co., Mo. App., 68 S.W.2d 852; Selinger v. Cromer, Mo.App., 208 S.W. 871. We are commanded by the terms of Section 512.160 RSMo 1949, V.A.M.S., not to reverse any judgment, where the error alleged to have been committed does not materially affect the merits of the action. Moloney v. Boatmen's Bank, supra.

In the case of Jones v. Central States Oil Company, 350 Mo. 91, 164 S.W.2d 914, the Supreme Court held that if the jury found that plaintiff was in a place where he had the right to be and was operating his car properly as required by the highest degree of care and if the jury further found that the defendant drove its truck into that part of the highway and against the rear end of plaintiff's car that surely such facts would conclusively show active negligence on defendant's part and that if the jury believed them, no result other than a finding of negligence could be reached.

In the case of Hughes v. St. Louis Public Service Company, Mo.App., 251 S.W.2d 360, decided by this court, we held that such a course of conduct on the part of the defendant made out a prima facie case of negligence against the person in charge of the overtaking vehicle. There is nothing in the facts in the instant case to show that plaintiff was not exercising the highest degree of care in the operation of her automobile and there was no attempt on the part of the defendant to charge or prove contributory negligence on the part of plaintiff.

Adverting to the facts outlined heretofore, we find that no dispute exists as to what caused the collision. Defendant's driver and witness admitted he had been following plaintiff's automobile for a block and a half. He admitted visibility was good and that if he had kept his eyes in front and looked straight ahead he could have stopped the taxicab in time to have avoided the collision. He admitted there was nothing to obstruct his vision, and that at the speed he was traveling there was distance enough to stop the cab if he had been looking. It was the duty of defendant's driver to keep a vigilant lookout to see and discover plaintiff's automobile on the highway. The testimony of the taxicab driver is an admission that he failed to keep the required lookout and instead engaged in an altercation with another automobile driver. It is undisputed that plaintiff's automobile had been stopped an appreciable length of time, plaintiff says one minute. It is undisputed that defendant's taxicab ran into the rear of plaintiff's automobile. Defendant's witness and driver admitted that he could have stopped his car if he had been maintaining a proper lookout. Can there be any question about defendant's negligence? We think not.

The facts we have stated which establish the negligence of defendant's driver were testified to by the taxicab driver who was defendant's witness. Defendant, therefore, is bound by his testimony, for the rule is well settled that when a party produces a witness to testify in his own behalf, he vouches for the credibility of that witness' testimony, and in the absence of contradic-

tory evidence, he is bound by such testimony. Harper v. St. Joseph Lead Co., Mo., 233 S.W.2d 835; Platt v. Platt, 343 Mo. 745, 123 S.W.2d 54; Mississippi Valley Trust Co. v. Francis, Mo.App., 186 S.W.2d 39; 31 C.J.S. Evidence § 311, p. 1089. There was no other testimony tending to contradict that of defendant's witness.

Upon a close examination of the evidence contained in the record before us we are unable to say that the criticisms, if true, leveled at Instruction No. 2 by the defendant are such as to materially affect the merits of the action. As we said before, the jury returned the only verdict authorized by the evidence. Any other verdict could not be allowed to stand and this is true even though Instruction No. 2 was erroneous. Defendant's complaint against the instruction is overruled for the reasons stated.

Defendant's next complaint is directed at Instruction No. 4 which authorized the jury to allow damages for impairment of plaintiff's ability to earn a livelihood and for future medical care and attention. Defendant contends that the evidence was insufficient to support an award for these items. In addition defendant contends the verdict is excessive. These contentions require a review of the evidence concerning plaintiff's injuries.

Plaintiff's testimony shows that immediately after the collision she had a headache and within an hour her "neck started to stiffen" and her "shoulders started feeling funny." He ankle was black and blue and her knee was swollen. Pain radiated from her back into her left hip and knee. She went to Dr. Bockelman who gave her some medicine that made her sleepy. She could not take this medicine and changed to Dr. William A. Stephens. He administered heat treatments and prescribed medicine to ease the pain. A bandage was applied to the knee, but no medication was applied. She continued working. However, approximately three weeks after the accident she stayed away from her work for a week. Dr. Stephens ordered a special corset which she wore for about three months and continues to wear it whenever her back gives her trouble. Sometime during the month of October or November 1956, while at work operating a cash register her "right arm went perfectly dead." At the suggestion of her boss she saw Dr. Lawrence Kotner who treated her and suggested that she see a physical therapist. She received five treatments from the physiotherapist who administered heat and massage. These treatments did help to relieve some of the pain.

Concerning her physical condition at the time of the trial her testimony shows that she continued to experience pain "now and then" in her arm, neck, shoulders, back, right arm, left hip and left knee. The pain in her hip and knee is more constant than the pain in the other parts of her body. The lower back, shoulders, neck, left hip and left knee at times get stiff and when the weather is damp or cold the pain is very severe and she is caused to limp when walking. When she steps up on a curb her knee seems to "give out." However, her knee is no longer swollen. She is still having trouble with her right arm.

It still feels numb and has no strength. She has lost strength in her back and is still bothered with headaches. She continues to do the work she formerly did, except for one function. She is unable to operate a billing machine, because it hurts her back to raise the carriage on the machine. She has been relieved from doing that part of the work she formerly did. Someone else has been assigned to this work.

The initial examination of plaintiff by Dr. William A. Stephens was on May 14, 1956. On that examination she complained of aching pain in her neck and lower back. There was tenderness over the bony prominences of the fifth and sixth cervical vertebrae and the left brink of the trapezius muscle. He also found tenderness over parts of the dorsal and lumbar spine.

There was mild local swelling of the capsule of the ankle joint. His diagnosis was a soft tissue strain of the neck and low back. The soft tissues he referred to were the musculature that supports the neck and back, also the ligaments and tendonous portions of those muscles. He saw her a total of 15 times and her symptoms were essentially the same on all of her visits. The examination before his last one took place November 16, 1956. The physical findings on that date were essentially the same as the earlier examinations with the exception that the swelling of the left ankle had subsided. On this visit she had some soreness of the left knee joint. The trial of this case took place about thirteen months after the accident. About one week before the trial plaintiff was again examined by Dr. Stephens. This examination disclosed tenderness in the same areas found tender on the first examination. She still complained of pain in the lower back, left hip and left knee. At times it caused her to limp and would interfere with her sleep at night. She continued to complain of stiffness in the neck with associated headaches. She still experienced an occasional sensation of numbness in her right forearm. He had prescribed a corset for her which she continued to wear at the time of her last examination. He said her condition was chronic and permanent and that she would continue to have pain in her neck and low back in the future.

Dr. Lawrence Kotner saw plaintiff the first time on September 28, 1956. She told him her right arm suddenly became numb that morning and she also complained of her lower back, left knee and hip. His examination disclosed marked tenderness over the lateral portion of the right elbow. He prescribed heat for the elbow and gave her some tablets to take. At some stage of his treatment he sent her to a physiotherapist for treatments. Dr. Kotner saw her a total of five times. His diagnosis was chronic sprain of the neck, right elbow, knee and hip. He testified that by chronic sprain he meant a type of sprain "which will endure for anywhere from several months to several years." He found definite limitation of movement of the neck in all directions. He said a neck sprain could produce pressure on the nerves as they emerge from the cervical vertebrae which will produce numbness in the forearm, also loss of strength in the elbow joint and pain when attempting to bear weight. On one of her visits he noted a definite swelling of the left knee. He found a chronic sprain of the left knee and hip which he said would be painful and would cause some restriction of movement. He thought only heat and rest could alleviate her pains.

Joseph Savan, a physical therapist who treats through remedial exercises, heat, electricity and manipulation, treated plaintiff five times. He found muscle spasm in her triceps and deltoid muscle. The last time he treated her there was no muscle spasm. He thought the areas affected may stay weak for a period of six months to a year.

█ Defendant's contention that the evidence was insufficient to support an award for impairment of plaintiff's earning capacity is without merit. The evidence shows that plaintiff was not able to do all the work she formerly performed. She is unable to operate the billing machine because she cannot raise the carriage and she had to be relieved of this duty. The medical evidence shows her condition is chronic and permanent and that there will be impairment in the use of her right arm when attempting to bear weight. We think this and other evidence which demonstrated the chronic nature of plaintiff's injuries which will endure for some time in the future was sufficient to authorize a submission of damages for impairment of earning capacity. The evidence is such as to show that plaintiff's injuries will affect her ability to do work requiring bending and lifting. Baker v. Norris, Mo.App., 248 S.W.2d 870; Rauch v. McDonnell Aircraft Corporation, Mo. App., 303 S.W.2d 226.

In the cases of Brooks v. McCray, Mo. App., 145 S.W.2d 985, and Williams v. Illinois Cent. R. Co., 360 Mo. 501, 229 S.W. 2d 1, 20 A.L.R.2d 322, relied on by defendant, the sole question considered was the alleged excessiveness of the verdict. Defendant is in error in asserting that the court in the case of Johnston v. Owings, Mo.App., 254 S.W.2d 933, loc. cit. 998, held that the evidence was not sufficient to support an award for damages for loss of future earning capacity. The court upheld the instruction submitting loss of future earning capacity in the following language:

"The above is sufficient evidence upon which to base an instruction authorizing a verdict for future pain and suffering and for future loss of earnings."

Defendant's next contention that the evidence was insufficient to support an award for future medical expenses must be overruled. While the evidence in this connection was somewhat meager, we feel it was sufficient from which the jury could find that the need for some future medical expense would be reasonably probable. The evidence shows that at the time of the trial plaintiff still suffered off and on from pain in her arm, neck, low back, left hip and knee and that her condition was permanent. Dr. Kotner said heat treatment may be needed in the future to alleviate plaintiff's pain. We think the evidence was sufficient to support submission of this item for the jury's consideration.

We next examine the contention of defendant that the verdict is excessive. In considering this contention we must consider the evidence most favorable to plaintiff and indulge in the presumption of right action on the part of the jury in finding that plaintiff was entitled to $3,500 and the trial court in approving the verdict. Page v. Wabash R. Co., Mo.App., 206 S. W.2d 691, loc. cit. 697. No precise yardstick of measurement can be applied to plaintiff's injuries to ascertain their money value. The facts in each case must be carefully considered. In the cases an effort is made to maintain reasonable uniformity in awards for similar injuries. However, we must also give effect to changed economic conditions in the years that elapsed since those awards were approved. Montana v. Nenert, Mo.App., 226 S.W.2d 394; Clayton v. St. Louis Public Service Company, Mo.App., 276 S.W.2d 621.

Defendant relies on two cases, Ulmer v. Farnham, Mo.App., 28 S.W.2d 113, decided in 1930, and Brooks v. McCray, supra, decided in 1940. The value of the dollar has decreased materially since those cases were decided and they are of little help today for purpose of comparison. More helpful are the cases of Clayton v. St. Louis Public Service Company, Mo.App.1955, 276 S.W.2d 621, and Montana v. Nenert, Mo.App.1950, 226 S.W.2d 394, decided by this court. The principal injuries sustained by the plaintiffs in those cases were similar in most respects to those sustained by plaintiff in the instant case. It must be admitted that the injuries when received by the plaintiff in the Clayton case were more severe than in the present case. However, the residual effects of the injuries were about the same in the two cited cases to those of plaintiff in this case. So was the prognosis. In the Clayton case we approved a verdict for $6,250. In the Montana case we approved $3,500.

The record discloses that plaintiff had $327.50 in medical expenses. Keeping in mind this factor and our duty to maintain reasonable uniformity of awards for similar injuries, with due consideration to the economic circumstances existing at this time and considering the evidence in the light most favorable to plaintiff, we cannot say that the verdict is so excessive as to shock the conscience of this court. On the contrary, we think the amount of the verdict is reasonable and fair.

The judgment should be affirmed. It is so ordered.

ANDERSON and WOLFE, JJ., concur.